**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 1:20-cr-237-CMH** |
| **ONKUR LAL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**I.    INTRODUCTION**

Onkur Lal, by and through undersigned counsel, respectfully files this Memorandum in Aid of Sentencing.  Mr. Lal comes before this Honorable Court both humbled and contrite following his acceptance of responsibility upon entering a plea of guilty to one count of Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. § 371. *See* Exhibit A.

Mr. Lal is only thirty (30) years old and is the younger of two sons. *See* PSR ¶ 77.  He engaged in the conduct at issue here from when he was 22 to 28 years old.  Mr. Lal's parents divorced when he was just ten (10) years old and he did not have a good relationship with his father growing up. *Id.* In fact, Mr. Lal recalls his father as being both verbally and physically abusive toward everyone in his family. *Id.* at 78. The divorce took an extreme toll on his mother, as she was left to fend for herself. For a period of time, Mr. Lal, his brother, and mother, lived at various motels and hotels trying to find stable housing. *Id.* The extreme financial hardships, combined with severe mental and emotional stress, led to Mr. Lal's mother committing suicide in 2014. *Id.* at 77.  Mr. Lal, who was extremely close to her, still struggles in dealing with her loss. *Id.* at 79.

However, Mr. Lal has moved on with his life and working toward bettering himself and his family. In 2019, he married, and in August 2020, his wife gave birth to their now-seven (7)

month old daughter. *Id*. at 81. Mr. Lal is being proactive in improving his mental health and is attending therapy on a regular basis. *Id*. at 86.

Each of the letters written by Mr. Lal's family and friends in support of him paints a picture of an honorable man who is family oriented and consistently goes out of his way to care for those he loves and to help those in need. *See* Exhibits B-E. Repeatedly, those who know him state that the instant offense is out of character for the man they love, know, respect, and support. *Id*. As such, each expresses considerable surprise that Mr. Lal committed the criminal offense in this matter, for which he has accepted full responsibility. *Id*.

Based upon Mr. Lal's personal history and characteristics, and the nature and circumstances of the offense, Mr. Lal respectfully requests that the Court impose a sentence of probation. Such a sentence would be "sufficient, but not greater than necessary" to achieve the legitimate purposes of sentencing,[1] particularly in light of Mr. Lal's minimal contact with the criminal justice system.

## II.    THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *Id.* at 51; *see also Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a).  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *Gall* at 49-50, and explain how the facts relate to the purposes of sentencing.  *Id.* at 53-60; *See also Pepper v. United States*, 131 S. Ct.

---

[1] *See* 18 U.S.C. § 3553(a).

1229, 1242-43 (2011).  The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough* at 101; *Pepper* at 1242-43.

In order to ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . ., as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*. at 101-02 (internal punctuation omitted) (*citing Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant."  *Pepper* at 1240 (citing *Wasman v. United States*, 468 U. S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)."  *United States v. Foreman*, 436 F.3d 638, 644, n.1 (6th Cir. 2006).  Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with

the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).

## III.     THE UNITED STATES SENTENCING GUIDELINES CALCULATION

There is a difference in the PSR's calculation of the guidelines and what Mr. Lal, and in some instances the government, believe the applicable guidelines range is in this case should be, as discussed below. *See* PSR Addendum p. 23-24. Mr. Lal respectfully submits that the proper guideline calculation is described below:

**2018 Guidelines**

| | |
|---|---|
| USSG § 2B1.1(b)(1)(J) – Base Offense Level | 6 |
| Loss Amount = More than $3,500,00 but less than $9,500,000 | +18 |
| Total | 24 |
| Acceptance of Responsibility USSG §3E1.1(a) | -2 |
| Acceptance of Responsibility USSG §3E1.1(b) | -1 |
| **TOTAL OFFENSE LEVEL** | **21** |

Mr. Lal has a criminal history score of zero and a criminal history category of I for sentencing purposes. *See* PSR at ¶¶ 70-72. These calculations, with a total offense level of twenty-one (21), would result in an advisory Guidelines range of 37-46 months of incarceration. *See* USSG Sentencing Table.

However, the PSR differs in its calculation of Mr. Lal's total offense level. The PSR claims the total loss amount was more than $9,500,000 but less than $25,000,000, and thus the applicable increase is twenty levels. *See* PSR ¶58. Both the government and the defense object to this calculation. *See* PSR addendum.

4

The PSR also indicates that because the loss amount was over $1,000,000 but less than $7,000,000 and was related to a government health care program, that a two-level increase is warranted pursuant to USSG § 2B1.1(b)(7)(i). *See* PSR ¶ 59. Further, the PSR claims the offense involved sophisticated means, thereby increasing the offense calculation by another two levels. *See* PSR ¶ 60. Lastly, the PSR claims there is an additional two-level increase because that Mr. Lal abused a position of public or private trust. *See* PSR ¶ 62. This would result in a total score of 29 after the subtraction of three levels for the acceptance of responsibility, and a Guidelines range of 87-108 months.

Mr. Lal objects to these enhancements. Regarding the loss amount, both the government and Mr. Lal agree that the loss amount increases the offense level by eighteen (18), not twenty (20) levels. *See* PSR addendum.

Mr. Lal contends that the two-level enhancement that the PSR asserts is applicable pursuant to USSG § 2B1.1(b)(7)(i),[2] constitutes double counting because the loss amount is already considered pursuant to USSG § 2B1.1(b)(1)(j). The government has agreed not to recommend that this enhancement be applied by the Court.[3]

Mr. Lal's conduct did not involve sophisticated means or an abuse of a position of trust. For most of duration of the fraud, Mr. Lal was a pharmacy technician and/or student and was not physically present at the pharmacy for a period of time. The majority of his conduct occurred as the result of instructions given to him by his purported mentor Mohammad Abdallah.

---

[2] *See* PSR ¶ 59.
[3] *See* United States' Sentencing Position, FN 1 (Dkt. 15)

The PSR concludes that that there is no evidence that Mr. Lal was in a leadership, supervisory, or managerial role during this offense.  See PSR ¶ 52. Thus, the two-level enhancements for sophisticated means and abuse of a position of trust do not apply.

Pursuant to the defense's calculation, Mr. Lal's total offense level would be 21, after subtracting the three levels for acceptance of responsibility. This results in an advisory Guideline range of 37-46 months.

## IV.     18 U.S.C. § 3553(A) FACTORS

### A.  The Nature and Circumstances of the Offense.

Mr. Lal's involvement in the instant offense is extraordinarily regrettable. As stated in Mr. Lal's letter to the Court, his intent is to "offer a sense of clarity as to how I ended up in this legal situation, as well as what I've learned as a result of my actions." *See* Exhibit A. In order to fully grasp what led Mr. Lal to the instance offense, the Court must consider his traumatic upbringing, and how it led to his vulnerability in allowing a mentor to influence him in making the biggest mistake of his life. *Id*.

The story begins with Mr. Lal's father, who verbally and physically abused him, his brother, and his mother. *Id*. Mr. Lal has painful memories of trying to physically stop his father from beating his mother. *Id*. Mr. Lal's parents are from India and had an arranged marriage. *Id*. It was very difficult for Mr. Lal's mother to obtain a divorce, and when she finally did when Mr. Lal was around the age of ten (10), it began an avalanche of worsening circumstances that led to his increased vulnerability. *Id*. Mr. Lal's mother's family sided with Mr. Lal's father, and they were abandoned by everyone and left to fend for themselves with no support. *Id*. Mr. Lal writes that his mother "received absolutely no emotional, or financial support from her own immediate family. My mother's heroic decision to choose to keep us safe, even if it meant disowning

traditional Indian values, left us without any ties ... My mother and my brother were the only family members that I had and we survived together." *Id.*

Mr. Lal's childhood home was soon foreclosed, and they "began to live a life without permanent housing." *Id.* Through social services programs, Mr. Lal, his brother, and his mother bounced around motels and hotels in and around the Northern Virginia area for quite some time. *Id.* They were a young family living in poverty, struggling to meet the basic necessities of everyday life, and Mr. Lal was determined to make "a better future for [himself] one day." *Id.*

When he was old enough to work, he got a job as a cashier at CVS, and this is where his interest in pharmacy began. *Id.* Mr. Lal picked himself up, graduated high school, attended Virginia Commonwealth University for his undergraduate studies, and subsequently earned a Doctorate in Pharmacy – all while working full time and putting himself through school. *Id.* After completing his bachelor's degree he continued to work as a pharmacy technician while applying to pharmacy school, and it was during this time that he met Mohammad Abdallah, the father-figure mentor who influenced him into the terrible life decisions for which he stands before the Court today. *Id.*

Mr. Lal admired Mr. Abdallah as a "successful entrepreneur/pharmacy owner" and a strong mentor/mentee relationship began to develop. Mr. Abdallah would often refer to Mr. Lal as his "adopted son" and Mr. Abdallah soon became a father figure mentor to Mr. Lal, supporting his desire to attend pharmacy school and even writing him a letter of recommendation for admission. *Id.* However, right before pharmacy school, Mr. Lal experienced another life tragedy that changed him forever. "On New Year's Day in 2014," Mr. Lal woke up to his mother not being home. He and his brother eventually filed a missing person's report, and it was later "discovered that my mother had committed suicide ... and her body had eventually washed up

somewhere in Maryland." *Id*. As Mr. Lal writes, "there's no pain or discomfort that compares the grief you experience when your only parent tragically dies." *Id*. After this heartbreak, Mr. Lal fell into a deep depression for which he is only now seeking therapy and healing.

However, it was also during this time that Mr. Lal was most vulnerable and got closer to Mr. Abdallah as he was invited to more family events that strengthened their bond. "I felt I had finally found the family that I never had … I developed a kind of loyalty to my mentor that was beyond professional … he was like a father to me, and appeared to want the best for me." *Id*. Mr. Abdallah and his wife went so far as to "vet" his now-wife when they were dating as parents would who care about their son's partner and future. *Id*.

Soon after, while working as a pharmacy technician at Mr. Abdallah's  pharmacy, he learned that Mr. Abdallah had "business relationships" with certain doctors, which were in place "to maintain profits within the pharmacy." *Id*. When Mr. Lal would question the unethical business practices, Mr. Abdallah would assure him that this is how things are done in independent pharmacies." *Id*. Although Mr. Lal takes full responsibility for his actions, he describes the situation as "like a child trusts their father's reassurance, I trusted Mo's response, believing this was a "normal" part of working within an independent pharmacy … engaging in unethical business practices with my mentor was like having my father telling me to do something, so I needed to do it … I needed Mo's support as a mentor and did not want to risk losing the only parental figure I had and the family that I had gained with Royal Care." *Id*. However, Mr. Lal now understands and realizes the error of his ways, explaining to the Court that he "wholeheartedly regrets allowing [himself] to be influenced by [his] mentor … in an effort to be a part of a family." *Id*.

Mr. Lal has learned a great deal from this experience, and understands that "one who truly cares about me would never expect me to compromise my personal values or jeopardize my future in exchange for their acceptance." *Id*. The most important lesson Mr. Lal learned was to "think for myself." *Id*. "I honestly believe if I would have done this from the start, I would not be in the compromising position I have put myself in today." *Id*. Mr. Lal suffered enormous public shame, lost his job, put his family in dire financial hardship, and is under investigation by the Virginia Board of Pharmacy and likely to lose his license to ever practice as a pharmacist again. *Id*.

However, Mr. Lal sees light at the end of the tunnel. He has obtained alternative employment in the car industry, and is overcoming the obstacles he faces head-on as he has done his entire life. Mr. Lal has learned his lesson, is deserving of this Court's leniency, and asks the Court "not to allow the series of unfortunate events that occurred with Mo Abdallah to define the rest of my life." *Id*.

**B.  Onkur Lal's History and Characteristics.**

Mr. Lal's wife, Vanessa Mackall Lal, considers it a "privilege" to write a letter of support for her husband. *See* Exhibit B. She describes Mr. Lal as the ideal husband and father, always there providing love and support in every way he can. Mr. Lal helped Vanessa achieve both her academic and professional goals – "whenever I needed words of encouragement, technical support, someone to proofread an assignment, a warm meal, a good laugh, or a shoulder to cry on, Onkur was there." *Id*. The one quality that Mrs. Lal expresses as her favorite that led her "to marry him," is Mr. Lal's resilience. *Id*.  Mrs. Lal explains how she was lucky enough to born into a "supportive, loving, protective, and financially stable family," but that Mr. Lal was not so fortunate. *Id*. "Despite experiencing a multitude of traumatic adverse life experiences," Mr. Lal

is a dedicated and father, remained committed to his life goals, and Mrs. Lal is always amazed at how Mr. Lal's "resilience carried him through." *Id.*

Mrs. Lal believes deeply that Mr. Lal's conduct in this case "is not a genuine reflection of his character as an individual or a professional," but instead was "the consequences of my husband's desperate need to have a family, and a reflection of how his vulnerability was taken advantage of by a superior within his professional field." *Id.* Mrs. Lal is proud of her husband for taking responsibility of his own actions, attending "individual counseling sessions, as well as marriage counseling to help him address the underlying issues that led him to make this big mistake," but most of all "choosing to heal from his most painful traumatic experiences." *Id.*

Mrs. Lal humbly asks the Court: "for the sake of our true family, which means everything to us, please administer justice in a way that holds my husband accountable, without further traumatizing him and/or setting back all of the personal and professional progress he has made." *Id.*

A recurring theme in the letters is Mr. Lal's traumatic childhood and how it led to extreme vulnerability in the instant offense. These are not just words by interested parties – they are clinical diagnoses and opinions from disinterested mental health professionals. *See* Exhibit C. Dr. David Shostak, a clinical psychologist, had been evaluating Mr. Lal for a period of over six months at the time the attached report was written. Dr. Shostak notes that Mr. Lal's parents' divorce "had a destabilizing impact upon him, rendering him vulnerable to certain situations and psychological events." *Id*; *see also* PSR at ¶86. Dr. Shostak opines that Mr. Lal became involved in the instant offense to impress, gain approval of, and become accepted by Mohammed Abdalla. *Id*. This became a coping mechanism and a way to overcome the "blanket rejection" and

10

"complete abandonment" of Mr. Lal's father. *Id*.  It's important to highlight that Dr. Shostak finds that Mr. Lal has "no component of criminality within his basic personality structure." *Id*.

Shayan Sen, a pharmacy manager for CVS, hired Mr. Lal in April of 2020 and was immediately "impressed by his work ethic and attitude." *See* Exhibit D. Mr. Sen describes Mr. Lal as "kind and caring," and tells the Court that the instant offense was "out of character." *Id*. Mr. Lal had a "long conversation" about the offense and Mr. Sen remembers Mr. Lal being "remorseful and was terrified of the consequences for his family." *Id*. When the press release regarding Mr. Lal's conviction came out, it had to be reported to CVS' corporate office. Mr. Sen fought for Mr. Lal's job as hard as he could because he believed in him, but ultimately, it was out of Mr. Sen's hands and Mr. Lal was terminated.

Sean Jackson was Mr. Lal's general manager at Malloy Ford Car Dealership until Mr. Jackson took another position elsewhere. He and Mr. Lal have been friends for five years and he views Mr. Lal as "a true leader in our community." *See* Exhibit E. Mr. Jackson misses working with Mr. Lal but is "confident" that Mr. Lal will "make the changes needed" and "walk the straight line." *Id*.

It is clear that Mr. Lal is a man of great integrity who made terrible mistakes. He is looked up to his colleagues and loved by his family. Mr. Lal is exactly the type of person who is deserving of this Court's leniency.

### C.  Mr. Lal Poses Little or No Risk of Recidivism.

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. Fortunately, Mr. Lal does not fit the archetype of a person who will commit new criminal offenses or recidivate. And because of the reinvigorated role of the judiciary in sentencing,

judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "there is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected as the Guidelines' offense level has long been recognized as not intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Thus, the guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C). Accordingly, *Booker* has freed the judiciary to remedy this inconsistency.

In addition to what has already been described about Mr. Lal's character demonstrating his ability to reform, the Commission has also objectively quantified his low likelihood of recidivism. For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases. *See Measuring Recidivism* at 12. More specifically with respect to Mr. Lal, who is 30 years old and no criminal history have a recidivism rate of only 13.3 %. *Id.* at 28. There is, quite simply, nothing in the record to make this Court reasonably believe that Mr. Lal would commit any criminal offense in the future.

The Commission has also found that first offenders like Mr. Lal are rarely reconvicted of a crime. In fact, only 3.5% of first offenders with zero criminal history points are ever reconvicted. *U.S Sentencing Comm'n, Recidivism and the First Offender* at Exhibit 6 (May of 2004) (hereinafter *First Offender*). Only 11.7% of all first offenders ever find themselves back in the criminal justice system (defined as reconviction, re-arrest, or revocation). *First Offender*

at Exhibit 6.  This is Mr. Lal's first felony conviction, and the experience taught him a valuable life lesson to ensure he does not repeat the mistakes of the past.

It is unfortunate that the Guidelines' offense levels do not take into consideration such data.  This data exists yet is not utilized to inform the Commission's rulemaking.  However, without even considering the circumstances of the offense, it is apparent that Mr. Lal is not a person who is statistically likely to recidivate.  And when one considers such statistics in light of Mr. Lal's history, it is safe to assume that he will never again be arrested or charged with an offense.

### D.  Mr. Lal's Public Demise Serves as Adequate Deterrence to Others

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct."  While white collar offenders like Mr. Lal are presumably the most rational of potential offenders, no difference in levels of deterrence was found between those who served terms of probation and imprisonment.  *See* David Weisburd et. al., *Specific Deterrence in a Sample of Offenders Convicted in White-Collar Crimes*, 33 CRIMINOLOGY 587 (1995).  Furthermore, "[t]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."  *See* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).

Arguably, the government has already substantially achieved the maximal deterrent effect of Mr. Lal's offense simply by charging and convicting him.  As a result, Mr. Lal's name and the substance of his offense will be discussed in numerous conversations and settings among family and friends and within certain professional environments for years to come, a shameful reality

from which he simply cannot escape. Further, Mr. Lal is undergoing investigation by the Virginia Department of Health Professions and he will likely lose his license to ever again practice as a pharmacist. In short, Mr. Lal's public professional demise sends a strong message to anyone foolish enough to attempt to undermine the integrity of the pharmaceutical billing processes.

Accordingly, Mr. Lal, by and through undersigned counsel, respectfully requests that the Court sentence him to a sentence of probation.

Respectfully submitted,


_____/s/_____
David Benowitz
Bar # 451557
*Counsel for Onkur Lal*
Price Benowitz LLP
409 7th Street, NW,
Suite 200
Washington, DC 20004
O: (202) 417-6000
M: (202) 271-5249
F: (202) 664-1331
David@PriceBenowitz.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 26th day of February 2021, I caused a true and correct

copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via ECF

to Assistant United States Attorney Monika L. Moore, United States Attorney's Office, 2100

Jamieson Avenue, Alexandria, Virginia 22314.

_____/s/_____
David Benowitz